FILED
U.S. DISTRICT COURT
DISTRICT OF MARYLAND

2012 DEC 17  AM 10: 10

CLERK'S OFFICE
AT BALTIMORE

BY_____ _____

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**BALTIMORE DIVISION**

JENNA RAGLANI
4606 Fait Avenue
Baltimore, MD, 21224

    Plaintiff,

v.

RIPKEN PROFESSIONAL
BASEBALL, LLC
d/b/a Aberdeen IronBirds
1427 Clarkview Road, Suite 100
Baltimore, MD, 21209

<u>Serve on Resident Agent:</u>
Lonnie M. Ritzer, Esq.
Shapiro, Sher, Guinot & Sandler, P.A.
36 S. Charles Street, 20th Floor
Baltimore, MD, 21201

    Defendant.

Case No. **CCB 12 CV 3682**
**JURY TRIAL DEMANDED**

## COMPLAINT

The Plaintiff, **JENNA RAGLANI**, (hereinafter, at times, "Plaintiff" or "Ms. Raglani"), by and through her counsel, **David E. Schreiber, Esq.**, files this Complaint against the Defendant, Ripken Professional Baseball, LLC, d/b/a Aberdeen IronBirds (hereinafter, at times, "Defendant," "IronBirds," or the "company") and states to the Court the following:

## PRELIMINARY STATEMENT

1. The Plaintiff, Jenna Raglani, brings this civil rights action to seek damages for personal and pecuniary injuries sustained as a result of her wrongful termination in violation of Title VII of the Civil Rights Acts of 1964 [42 U.S.C. §2000e, *et seq.*] ("Title VII"), as amended by the Civil Rights Act of 1991 [42 U.S.C. §1981a, *et seq.*] the Maryland Fair

Employment Practices Act ("FEPA") Article 49B, as well as Maryland common law.

2. The Defendant, Ripken Professional Baseball, d/b/a the IronBirds, terminated Ms. Raglani on or about July 6, 2011, for allegedly breaching the company's "anti-fraternization policy," by having a romantic relationship with a fellow employee, and for allegedly obstructing an "investigation" into a social event (the "Party") where she kissed this employee. The "investigation" and eventual termination of Ms. Raglani was unexpected because her male colleagues openly breached the IronBirds's "anti-fraternization policy" and were neither "investigated" nor terminated from their positions. In fact, several of them are still employed in their positions to this day. Ms. Raglani, however, was treated in a disparate fashion; she was subjected to a humiliating investigation, summarily terminated, and denied review of the decision. She was left without a job and with a tarnished reputation in Baltimore's sports industry. Ms. Raglani files this complaint to rectify the disparate treatment suffered by her, in significant part, because of her gender.

3. Accordingly, Ms. Raglani seeks back pay, front pay, compensatory and punitive damages, and an award of attorneys' fees and costs, pursuant to Title VII, Maryland's FEPA, and other relief as the Court may deem equitable and just.

## COMPLIANCE WITH ADMINISTRATIVE REMEDIES

4. Ms. Raglani filed a timely charge of discrimination with the Equal Employment Opportunity Commission (EEOC) on October 18, 2011. She cross-filed with the Maryland Commission on Civil Rights on the same date. Ms. Raglani received her right to sue letter on October 1, 2012, and the filing of this complaint has occurred within 90 days. A copy of the notice of the right to sue is attached as Exhibit A. See 42 U.S.C. §2000e-5(f)(1).

## JURISDICTION AND VENUE

5. The United States District Court for the District of Maryland may exercise original subject-matter jurisdiction over this case pursuant to 28 U.S.C. §1331, 28 U.S.C. 1343(a)(4), and 42 U.S.C. §2000e-5(f)(3) because it arises under the laws of the United States and seeks redress for violations of civil rights. The Court may also maintain supplemental jurisdiction over Maryland common law claims pursuant to 28 U.S.C. §1367(a) and Rule 18(a) of the Federal Rules of Civil Procedure because they are sufficiently related to the claims within the Court's original jurisdiction that form part of the same case or controversy. This Court can award liquidated damages, compensatory, and punitive damages pursuant to 24 U.S.C. §1981a and reasonable attorney's fees and costs pursuant to 42 U.S.C. §2000e-5(f), (g), (k) and Rule 54 of the Federal Rules of Civil Procedure.

6. Venue is governed by 42 U.S.C. 2000e-5(f)(3). Venue in this Court is appropriate because the unlawful employment action occurred in this judicial district. All records, documents, and virtually all the witnesses relevant to this complaint are located in this judicial district. It is also proper under 28 U.S.C. §1391(b)(2) because this is the judicial district where the Defendant, Ripken Professional Baseball, LLC, is located.

## PARTIES

7. The Plaintiff, Jenna Raglani, is an adult female residing in Baltimore, Maryland. Plaintiff, at all relevant times herein, was an employee of Ripken Professional Baseball's IronBirds organization.

8. The Defendant, Ripken Professional Baseball, LLC, a Maryland corporation, is

a sales and marketing company, with its principal office located at 1427 Clarkview Road, Suite 100, Baltimore, Maryland 21209. The company oversees the business and philanthropic work of Cal Ripken, Jr. and Bill Ripken. Ripken Professional Baseball, LLC operates the Aberdeen IronBirds, a minor league affiliate of the Baltimore Orioles, located at 873 Long Drive, Aberdeen, Maryland, 21001.

9. The Defendant, Ripken Professional Baseball, LLC is a person within the meaning of 42 U.S.C. §2000e(a), and an employer within the meaning of 42 U.S.C. §2000e(b). It is also an employer within the meaning of Maryland's FEPA Article 49B, §15.

## STATEMENT OF FACTS

10. Ms. Raglani is a graduate of Allegheny College, where she majored in Mass Communications. She focused her studies on sports management, marketing, and accounting and interned with the Eastern League's Altoona Curve, a Double-A (AA) affiliate of the Pittsburgh Pirates, during college. After graduating, Ms. Raglani was offered a position as an Account Representative with the Aberdeen IronBirds on or about July 24, 2006.

11. Ms. Raglani excelled in her position and helped manage five successful seasons for the IronBirds. The IronBirds management recognized her achievements and dedication by promoting her to be the Assistant General Manager of Ticket Sales in October, 2010. As an assistant manager, Ms. Raglani became one of the few females in a senior management position at the IronBirds.

12. As an assistant manager, Ms. Raglani was directly supervised by Aaron Moszer, the General Manager of the IronBirds. She was also accountable to the Vice President of the IronBirds, Jeff Eiseman, and the IronBirds's co-owner and Executive Vice

President, Bill Ripken.

I. **THE IRONBIRDS'S ANTI-FRATERNIZATION POLICY**

13. Beginning in or about 2008, the IronBirds instituted an anti-fraternization policy (the "Policy") in its employment handbook. The policy prohibited dating and sexual relations (hereinafter, at times, "romantic conduct") between IronBirds employees and, in particular, disallowed upper management from dating subordinate employees.

14. Despite this company-wide policy, dating and "romantic conduct" among upper management and subordinate employees were commonplace. The Policy was never strictly enforced, with instances of office dating only being met with minor sanctions, if any.

15. Ms. Raglani's General Manager, Aaron Moszer ("Mr. Moszer") dated Joey Helsel, a subordinate employee. Ms. Raglani was well aware of this relationship and observed the two individuals actually engaging in "romantic conduct", during work hours, in the IronBirds's luxury skybox. Jeff Eiseman and Bill Ripken were also aware of this relationship, but merely reprimanded Mr. Moszer with only a warning. Mr. Moszer's conduct was never investigated nor was he ever reprimanded, suspended, or terminated for his conduct. He is still the General Manager and recently was promoted to be Assistant Vice President of Sales.

16. It was also commonplace for members of senior-level management to date and engage in a sexual relationship with one another. Jeff Eiseman ("Mr. Eiseman"), the Vice President of the IronBirds, had a romantic relationship with the Vice President of Human Resources, Missy Martin ("Ms. Martin"). Ms. Martin confided to Ms. Raglani certain details of her relationship with Mr. Eiseman. Despite this relationship being known to Defendant's upper management and owners, Mr. Eiseman's conduct was never investigated nor was

he reprimanded, suspended, or terminated for his conduct.

17. Lower-level IronBirds employees would often date and engage in sexual relations with one another. For instance, Andy Levy, an IronBirds employee, had a relationship with an intern, Amanda Bereznay. This relationship was widely known, yet Mr. Levy's conduct was never investigated nor was he reprimanded, suspended, or terminated for his conduct.

18. Given this culture of intra-office romance and apparent lack of enforcement of the so-called Policy, Ms. Raglani began a romantic relationship with Brian Magee ("Mr. Magee") in 2011.

19. Mr. Magee was employed by Ripken Amateur Baseball, a separate entity outside of the IronBirds's organization, but also managed by Ripken Professional Baseball, LLC. He was not a direct subordinate of Ms. Raglani.

20. Ms. Raglani was not aware she was violating the Policy because Mr. Magee was not a direct subordinate of hers and he was employed outside of the IronBirds's organization. Ms. Raglani even spoke with Mr. Mozser about her desire to begin a romantic relationship with Mr. Magee. Mr. Moszer condoned the relationship and encouraged Ms. Raglani to start one with Mr. Magee if she so desired.

II. **THE JUNE 18, 2011 PARTY AND THE IRONBIRDS' "INVESTIGATION"**

21. On Saturday, June 18, 2011, Andy Levy and Lee Greeley, two IronBirds employees, hosted a party at their home. Ms. Raglani and Mr. Magee both attended. At this party, Ms. Raglani and Mr. Magee kissed each other, openly displaying their affection for one another.

22. When news of this kissing circulated among employees at the IronBirds, Mr.

Moszer became concerned. He initiated a formal "investigation" into the details of the June 18, 2011, party (the "Party").

23. Unbeknownst to Ms. Raglani, on June 21, 2011 Mr. Moszer began interviewing all the employees who attended the Party. Mr. Moszer informed each employee that the "investigation" was confidential and that they should be truthful in their recollection of the events at the Party. Upon information and belief, several employees were interviewed for several hours that day. Ms. Raglani and Mr. Magee, the targets of the "investigation", were not called in for an interview that day.

24. During the evening of June 21, 2011, after work hours, Ms. Raglani received a phone call from one of the employees that Mr. Moszer had interviewed earlier that day. This employee told Ms. Raglani that Mr. Moszer was investigating the details of the Party. This employee did not tell Ms. Raglani that the "investigation" was confidential.

25. Upon hearing this, Ms. Raglani contacted a few employees to inquire about the "investigation". Honoring the purported confidential nature of the "investigation", none of these employees gave Ms. Raglani specific information about the questions asked of them, their answers, or the purpose behind the "investigation"; they only told Ms. Raglani that Mr. Moszer was concerned about what happened at the Party and wanted more information.

26. Later that evening, Ms. Raglani called Mr. Magee. Mr. Magee had also learned about the "investigation" and was concerned that his job was in jeopardy. He told Ms. Raglani that he planned to be less than candid about their kissing at the party and their relationship. Ms. Raglani told Mr. Magee that he should be truthful and told him that she would call Kari Rumfield, the Assistant General Manager of Sponsorship and a personal friend, for advice on how they should handle the situation.

27. After explaining the situation to Ms. Rumfield, Ms. Raglani was advised to cooperate with the "investigation" and to be truthful. Ms. Rumfield further advised her that their jobs were not in jeopardy so long as they were honest. Ms. Raglani relayed this advice to Mr. Magee in a subsequent phone call. Mr. Magee agreed that they should both be honest and forthcoming when questioned about the Party the following day.

28. On June 22, 2012, however, Mr. Magee apparently decided to be less than truthful when questioned by Mr. Moszer about the Party. As related to Ms. Raglani, Mr. Magee initially told Mr. Moszer that nothing happened between him and Ms. Raglani at the Party. There was no kissing or "making out." He told them he was not romantically involved with Ms. Raglani. The interview ended.

29. As further related to Ms. Raglani, shortly thereafter, Mr. Magee was called again to be re-interviewed and questioned. Overburdened by the pressure, Mr. Magee apparently confessed that he had not been truthful and admitted that he was in a romantic relationship with Ms. Raglani. Concerned about his job, however, Mr. Magee tried to shift the blame to Ms. Raglani by claiming that she "coached" him to be dishonest the night before.

30. After Mr. Magee's "confession," Mr. Moszer summoned Ms. Raglani to be interviewed. When questioned about the party, Ms. Raglani told the truth: she did kiss Mr. Magee and admitted that they had started dating, something that Mr. Moszer had condoned earlier. She also candidly told Mr. Moszer that an IronBirds' employee called her the night before and told her there was an ongoing "investigation" and that she, thereafter, contacted other employees to inquire about the "investigation", not initially aware of the confidential nature of the Defendant's inquiries. She also advised Mr.

Moszer that when these employees told Ms. Raglani the "investigation" was "confidential," she ceased inquiring about the "investigation".

## III. MS. RAGLANI IS TERMINATED AND TOLD TO "KEEP QUIET"

31. After the "investigation" concluded, Ms. Raglani was summarily terminated from her position on or about July 6, 2011.

32. Mr. Moszer informed Ms. Raglani that she breached the company's anti-fraternization policy and because she "engaged" and "orchestrated" an "intentional campaign to obstruct" his investigation into the Party.

33. After receiving her termination letter, Ms. Raglani was not offered a right to review or challenge the findings of the "investigation" and Mr. Moszer's decision to fire her. The IronBirds' Employment Manual specifically provides for such a review, if requested. Instead, Mr. Moszer informed Ms. Raglani that the decision was "final."

34. Mr. Moszer also warned Ms. Raglani not to discuss with anyone at Ripken Professional Baseball, LLC, the circumstances of her termination, and the intra-office romance of certain key employees, such as Aaron Moszer and Mr. Eiseman, with other employees.

35. Concerned that any "whistle blowing" would further cause harm to her name and reputation, Ms. Raglani remained silent and did not request a further appeal of Mr. Moszer's decision. She later retained counsel and filed a charge for gender discrimination with the EEOC on or about October 18, 2011, to voice her concerns about this disparate treatment.

## CAUSES OF ACTION

### COUNT I
### (GENDER DISCRIMINATION—42 U.S.C. §2000e-2(a))

36. The Plaintiff hereby incorporates by reference the facts set forth in paragraphs 1 through 35, and all subsequent allegations of facts, as though set forth fully and at length herein.

37. The Plaintiff is a female, and, as such, is a member of a protected class.

38. The Defendant obviously knew that Plaintiff was a female at the time she was subjected to the above noted adverse employment actions, which specifically include treating women differently under the Defendant's Anti-Fraternization policy, subjecting women, not men, to humiliating "investigations" to enforce the policy, and denying her, as a female, the right to review of an employment termination decision.

39. Prior to the termination of her employment, the Plaintiff had maintained a good employment record with the Defendant, had not been disciplined or reprimanded in connection with the discharge of her duties, and was otherwise a good, efficient, and successful employee.

40. The Plaintiff was discriminated against with respect to the terms, conditions, and privileges of her employment and was ultimately sanctioned and discharged because of her gender, a violation of 42 U.S.C. §2000e-2(a).

41. The Defendant undertook the actions alleged herein in a wanton disregard for the Plaintiff's constitutional and statutory rights.

42. As a direct result and consequence of the Defendant's violation of the Plaintiff's constitutional and statutory rights, the Plaintiff has suffered monetary damages, including,

but not limited to, lost wages, lost benefits, damage to her personal and professional reputation, and mental distress and anguish.

WHEREFORE, the premises considered, the Plaintiff demands relief as specified hereinafter.

## COUNT II
## (GENDER DISCRIMINATION–MARYLAND ARTICLE, ARTICLE 49B)

43. The Plaintiff hereby incorporates by reference the facts set forth in paragraphs 1 through 42, and all subsequent allegations of facts, as though set forth fully and at length herein.

44. The termination of Plaintiff's employment was done in violation of a clear mandate of public policy and was done intentionally and with actual malice solely because of the Plaintiff's gender. The Maryland Fair Employment Practices Act (FEPA) states:

> It is hereby declared to be the policy of the State of Maryland, in the exercise of its police power for the protection of the public safety, public health and general welfare, for the maintenance of business and good government and for the promotion of the State's trade, commerce and manufacturers to assure all persons equal opportunity in receiving employment and in all labor management-union relations regardless of race, color, religion, ancestry or national origin, **sex**, age, marital status, sexual orientation, or disability unrelated in nature and extent so as to reasonably preclude the performance of the employment, and to that end to prohibit discrimination in employment by any person, group, labor organization, organization or any employer or his agents. Md. Code Ann., art. 49B §14 (2001) (emphasis added).

45. The Defendant violated the Maryland statute by treating women differently, by enforcing it's purported Anti-Fraternization policy in a discriminatory manner against women. The Defendant subjected Ms. Raglani to a humiliating "investigation" and terminated her for breaching a policy that her male colleagues had openly violated. Ms. Raglani was denied any review of the decision that would normally be granted to a male

employee, if the policy was actually enforced.

46. As a direct consequence of the Defendant's violation of the Plaintiff's Maryland statutory rights, the Plaintiff has suffered monetary damages, including, but not limited to, lost wages, lost benefits, damage to her personal and professional reputation, and mental distress and anguish.

WHEREFORE, the premises considered, the Plaintiff demands relief as specified hereinafter.

## COUNT III
## (NEGLIGENT TRAINING AND SUPERVISION)

47. The Plaintiff hereby incorporates by reference the facts set forth in paragraphs 1 through 46, and all subsequent allegations of facts, as though set forth fully and at length herein.

48. The Plaintiff's constitutional rights to be free from discrimination based on her gender were violated when the Defendant negligently trained and supervised Mr. Moszer.

49. A reasonable employer would have properly trained and supervised Mr. Moszer with respect to gender relations and company policies, including the Anti-Fraternization policy as well as an employee's unconditional right to request a review of a termination decision.

50. Both Jeff Eiseman and Bill Ripken knew that Mr. Moszer had breached company policies in the past, including the company's own Anti-Fraternization policy, but did not take any action to ensure that the IronBirds' General Manager, Mr. Moszer, complied with IronBirds' policies.

51. By Defendant's failure to adequately train and supervise Mr. Moszer, he was able to proceed, unchecked, with a humiliating "investigation" of Ms. Raglani and to wrongfully terminate her employment, together with the explicit threat not to speak about her termination or to seek an appeal of his decision.

52. The actions, conduct, and omissions of the Defendant as alleged in this Complaint occurred in violation of, and with deliberate indifference to, the Plaintiff's rights to be free from discrimination under Title VII and Maryland's FEPA, Article 49B.

53. As a direct result of the Defendant's negligence in training and supervising Mr. Moszer, the Defendant allowed the discrimination against Plaintiff to occur.

54. But for the Defendant's action, conduct and omissions, as alleged in this complaint, the Plaintiff would not have been wrongfully terminated.

55. As a direct consequence of the Defendant's negligence, the Plaintiff has suffered monetary damages, including, but not limited to, lost wages, lost benefits, damage to her personal and professional reputation, and mental distress and anguish.

WHEREFORE, the premises considered, the Plaintiff demands relief as specified hereinafter.

## COUNT IV
## (WRONGFUL DISCHARGE)

56. The Plaintiff hereby incorporates by reference the facts set forth in paragraphs 1 through 55, and all subsequent allegations of facts as though set forth fully and at length herein.

57. Ms. Raglani's termination was improper and occurred without just cause. Ms. Raglani did not neglect or fail to perform any work duties.

58. The termination of Ms. Raglani's employment was contrary to a clear mandate of public policy, in that the Defendant terminated the Plaintiff's employment because of her gender, in violation of Ms. Raglani's statutory rights pursuant to Title VII and Maryland's FEPA, Article 49B.

59. As a direct consequence of the Defendant's violation of the Plaintiff's federal and Maryland statutory rights, the Plaintiff has suffered monetary damages, including, but not limited to, lost wages, lost benefits, damage to her personal and professional reputation, and mental distress and anguish.

WHEREFORE, the premises considered, the Plaintiff demands relief as specified hereinafter.

## COUNT V
## (BREACH OF CONTRACT)

60. The Plaintiff hereby incorporates by reference the facts set forth in paragraphs 1 through 59, and all subsequent allegations of facts, as though set forth fully and at length herein.

61. During Ms. Raglani's employment with the IronBirds, the Defendant circulated among its employees, and Ms. Raglani in particular, an employment manual outlining the rights and responsibilities of IronBirds' employees. This employment manual constituted, in part, a contract between the parties.

62. Among theses rights and responsibilities, was a right to request an appeal of a termination decision within Ripken Professional Baseball, LLC.

63. Upon being terminated, however, Ms. Raglain was warned by Mr. Moszer not to appeal the decision and to "keep quiet" about the "investigation". She was informed that any request for review of his decision would not be accepted.

64. At the time, Ms. Raglani did not challenge the decision out of fear that any assertion of her protected rights against Mr. Moszer and the Ripken organization would only further tarnish her reputation in Baltimore's sports industry. She left the organization quietly, as instructed.

65. As a result of this breach of contract, Ms. Raglani has suffered monetary damages, including, but not limited to, lost wages, lost benefits, damage to her personal and professional reputation, and mental distress and anguish.

WHEREFORE, the premises considered, the Plaintiff demands relief as specified hereinafter.

## RELIEF REQUESTED

WHEREFORE, the premises considered, the Plaintiff, **JENNA RAGLANI**, demands judgment against the Defendant, granting the following relief as to all counts such that the Court:

a. Award to Plaintiff her lost income (both back pay and front pay, at an appropriate salary) together with other employment benefits;

b. Award to Plaintiff compensatory damages;

c. Award to Plaintiff liquidated damages;

d. Award to Plaintiff punitive damages;

d. Award to Plaintiff pre-judgment and post-judgment interest;

e. Award to Plaintiff her reasonable attorneys' fees and costs and disbursements associated with prosecution of this action; and

f. Such other and further relief as this Court may deem just and proper.

I, **JENNA RAGLANI**, do hereby solemnly declare and affirm under the penalties of perjury that the foregoing statements are true and correct to the best of my knowledge, information and belief.

JENNA RAGLANI

Respectfully submitted,

DAVID E. SCHREIBER, P.C.

By: _____
David E. Schreiber, Esq., #7792
4550 Montgomery Avenue, Suite 760N
Bethesda, Maryland 20814
(301) 951-1530
*Counsel for Plaintiff*

## DEMAND FOR JURY TRIAL

The Plaintiff demands a jury trial in this action.

David E. Schreiber, Esq.